OPINION
{¶ 1} The state appeals the November 15, 2002 judgment entry of the Ashtabula County Court of Common Pleas granting Paul Hatcher's ("Paul") motion to suppress. For the reasons set forth below, we affirm the decision of the trial court in this matter.
 {¶ 2} Sheriff deputies were called to the residence of Paul and his wife, Deborah ("Deborah"), on January 12, 2002, in response to a domestic complaint. Upon arrival and after observing injuries to Deborah, Paul was arrested and taken to the Ashtabula County jail. Deborah proceeded to inform the deputies remaining at the scene about some drugs that were kept in a safe at the residence. Deborah executed a consent form consenting to a search of the residence, a shed, and a vehicle.
 {¶ 3} Since Deborah did not know the location of the key to the safe, she and the deputies began to search the residence for the key. At some point, Deborah located a ring of keys. After trying each of the keys on the safe, however, it was determined that none of the keys were for the safe. Thus, the search for the key continued. Deputy Paul Dibble ("Deputy Dibble") eventually discovered the key hidden in a plastic electrical box located in a cabinet in the same room as the safe. The deputies opened the safe and discovered, among other items, methamphetamine and marijuana.
 {¶ 4} Paul was charged with trafficking in methamphetamine in violation of R.C. 2925.03(A)(2), possession of methamphetamine in violation of R.C. 2929.11(A), possessing criminal tools in violation of R.C. 2923.24(A), and trafficking in marijuana in violation of R.C. 2925.03(A) and R.C. 2925.03(C)(3)(a). Paul pleaded not guilty to all counts.
 {¶ 5} On May 24, 2002, Paul filed a motion to suppress. The trial court conducted a hearing regarding the motion on July 17, 2002. Deborah testified at the hearing. After Deborah's testimony, the hearing was continued until November 8, 2002. Deputy Mark Allen ("Deputy Allen"), Deputy Greg Leonhard ("Deputy Leonhard"), Deputy William Niemi ("Deputy Niemi"), and Deputy Dibble testified at the second hearing. On November 15, 2002, the trial court granted Paul's motion to suppress the evidence located in the safe, finding that Deborah "did not have the authority to grant the officers access to the safe in the computer room, and her repeated references to it as being her husband's safe put the officers on notice of that fact."
 {¶ 6} The state timely appealed raising the following assignment of error:
 {¶ 7} "The trial court committed reversible error when it granted appellee's motion to suppress evidence."
 {¶ 8} In its sole assignment of error, the state argues that the trial court's findings of fact were not supported by competent and credible evidence. The state also argues that the deputies had a reasonable, good faith belief that Deborah had authority to grant consent to the search of the safe. Thus, the state claims there was no Fourth Amendment violation. The state finally asserts that, even if the trial court's findings were supported by clear and convincing evidence, the evidence would be admissible under the inevitable discovery doctrine because the state possessed the requisite probable cause necessary to obtain a search warrant and would have done so if they were not granted consent by Deborah.
 {¶ 9} The trial court acts as trier of fact at a suppression hearing and must weigh the evidence and judge the credibility of the witnesses. State v. Hill, 75 Ohio St.3d 195, 208,1996-Ohio-222. Since the trial court is in the best position to resolve the factual issues, State v. Searls (1997),118 Ohio App.3d 739, 741, citing State v. Mills (1992),62 Ohio St.3d 357, 366, an appellate court is bound to accept the trial court's factual determinations as long as they are supported by competent and credible evidence. Searls,118 Ohio App.3d at 741. Once the appellate court accepts the trial court's factual determinations, the appellate court conducts a de novo review of the trial court's application of the law to these facts. Id.
 {¶ 10} In this case, since the state challenges the trial court's factual determinations, we must first determine whether there is competent and credible evidence to support these determinations. "When considering an appeal of a ruling on a motion to suppress we review the trial court's findings of fact only for clear error and give due weight to inferences the trial judge drew from the facts." State v. Hummel,154 Ohio App.3d 123, 2003-Ohio-4602, at ¶11. We must examine whether the trial court's findings are against the manifest weight of the evidence. Id. In doing so, we must be cognizant of the fact that the weight to be given the evidence and the credibility of the witnesses is within the purview of the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 11} The trial court found that, since Deborah testified that she did not have permission to access the safe and that she did not have a key or know the location of the key, she was without authority to grant consent to search the safe. Moreover, the trial court found that the deputies were put on notice that she did not have common authority over the safe by her references to the safe as Paul's safe and her lack of knowledge of the key's location and its distinctive shape. Thus, the trial court determined that the deputies did not have a reasonable belief that Deborah had common authority over the safe.
 {¶ 12} At the suppression hearing, Deborah testified that she had never been in the safe, that she had never had access to the safe, that she did not have a key or know where the key was located, and that Paul did not permit her access to the safe. She also testified that, in her conversations with the deputies, she referred to the safe as her husband's safe, that she told the deputies that it was her husband's safe, and that she informed the deputies that she did not know where Paul kept the key.
 {¶ 13} Deputy Niemi testified that Deborah referred to the safe as Paul's safe. Deputy Niemi further testified that when he filled out a police report regarding the search, he indicated that Deborah said the safe was "his safe." Deputy Niemi also testified that, to his understanding, it was Paul's safe. Each of the deputies testified that Deborah had no knowledge of the location of the key to the safe. In fact, there was extensive testimony regarding the prolonged search for the key. The testimony reveals that each of the deputies on the scene, at least three in all, and Deborah were searching the residence for the key. At some point, Deborah discovered a ring of keys. Thinking she had found the key to the safe, Deborah unsuccessfully attempted to unlock the safe. Thus, the search continued until Deputy Dibble discovered the key hidden in a plastic electrical box located in the cabinet. The testimony indicated that the key was a unique round barrel shaped key. The testimony disclosed that the total search for the key took anywhere between 15 minutes to an hour. Finally, the deputies admitted that they never inquired about Deborah's access to the safe or her authority to enter the safe because they assumed the safe was "joint property."
 {¶ 14} Although Deputy Dibble testified that Deborah referred to the safe as "their safe," granting the trial court its due deference in weighing the evidence and the credibility of the witnesses, DeHass, 10 Ohio St.2d 230, at paragraph one of the syllabus, we find that there was sufficient evidence proffered to support the trial court's factual determinations. Thus, we find that the trial court's findings are supported by competent and credible evidence. That being said, we are bound to accept these factual findings as accurate, and we now must "independently determine as a matter of law whether the applicable legal standard has been satisfied." See State v. Burrows, 11th Dist. No. 2000-T-0089, 2002-Ohio-1961, 2002 Ohio App. LEXIS 1918, at *8, citing State v. Retherford (1994), 93 Ohio App.3d 586, 592.
 {¶ 15} The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *." The Fourth Amendment is enforceable against the states through the Due Process Clause of the Fourteenth Amendment. Mapp v. Ohio (1961), 367 U.S. 643, 655. Warrantless searches are per se unreasonable, Katz v. United States (1967),389 U.S. 347, 357, and generally are prohibited. Illinois v.Rodriguez (1990), 497 U.S. 177, 181 (citations omitted). "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, see Schneckloth v. Bustamonte,412 U.S. 218, [222] * * * (1973), or from a third party who possesses common authority over the premises." Rodriguez, 497 U.S. at 181
(citation omitted). The consent to search can come "from a third party who possessed common authority over or other significant relationship to the premises or effects sought to be inspected."United States v. Matlock (1974), 415 U.S. 164, 171.
 {¶ 16} "Common authority is * * * not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, * * * but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. at 171, n7 (internal citations omitted). The state bears the burden of establishing the existence of common authority. Rodriguez,497 U.S. at 181.
 {¶ 17} A spouse is presumed to have authority to consent to a search of all areas of the residence. United States v. Duran
(C.A. 7, 1992), 957 F.2d 499, 505. However, "the scope of spousal consent should be limited to a search of areas of the abode under common control, as distinguished from a search directed toward the personal effects of the absent spouse." State v. McCarthy
(1971), 26 Ohio St.2d 87, 91; see, also, State v. Bell (May 6, 1993), 8th Dist. No. 62325, 1993 Ohio App. LEXIS 2383, at *21 (citation omitted) ("Consent to search a container is effective only when given by one with common authority over or other sufficient relationship to the premises or effects sought to be inspected."); Duran, 957 F.2d at 504 ("spouses do not surrender every quantum of privacy or individuality with respect to one another"); United States v. Shugart (E.D.Tex., 1995),889 F. Supp. 963, 982 (citation omitted) ("the spouse may authorize the search of only those items or places over which he or she has a common right of access or shared dominion"); United States v.Robinson (D.Mass., 1998), 999 F. Supp. 155, 161 (citation omitted) ("When a third party grants consent to search a room he or she is not necessarily consenting to a search of the closed items within the room.").
 {¶ 18} The presumption of spousal consent can be rebutted "by showing that the consenting spouse was denied access to the particular area searched." Duran, 957 F.2d at 505. Thus, in order to effectively "prevent a spouse who has full access to the marital home from giving valid consent[,] * * * the property [must] * * * be under the exclusive control of the non-consenting spouse and the non-consenting spouse [must] * * * deny access to the consenting spouse." United States v. Shelton (N.D.Miss., 2001), 181 F. Supp.2d 649, 656 (citation omitted).
 {¶ 19} In this case, the evidence demonstrates that Deborah did not have common authority over the safe. At all times, the safe was in the exclusive control of Paul, as Deborah was denied access to the locked safe, as well as to the key to the safe. Moreover, Deborah was not permitted to use the locked safe, nor had she ever done so. Thus, Deborah did not have the authority to consent to the search of the safe. See State v. Masten (Sept. 29, 1989), 3rd Dist. No. 5-88-7, 1989 Ohio App. LEXIS 3723, at *16 (the consenting spouse did not have authority to consent to a search of a locked cabinet, which was exclusively used by the non-consenting spouse, where the consenting spouse neither had access to the cabinet nor the key); cf. United States v. Sealey
(C.A. 9, 1987), 830 F.2d 1028, 1031 (the failure to proffer any evidence that indicated that the consenting spouse was forbidden or restricted access to the area searched was fatal to the non-consenting spouse's claim that the consenting spouse did not have common authority over the area searched); White v. UnitedStates (C.A. 10, 1971), 444 F.2d 724, 726 (since there was no indication that the item searched was the exclusive property of the non-consenting "spouse," the consenting "spouse" had common authority regarding that item); United State v. Harrison
(D.C. Cir., 1982), 679 F.2d 942, 947 (since there was nothing to demonstrate that the item searched was owned or in the exclusive control of the non-consenting spouse and since the item searched was not sealed, the consenting spouse had common authority over the searched item).
 {¶ 20} The lack of actual common authority, however, does not necessarily render the warrantless search unconstitutional. A warrantless search premised on an officer's reasonable belief that the consenting party had authority to consent to the search of the premises is lawful. Rodriguez, 497 U.S, at 188 (citation omitted). When the surrounding circumstances raise doubts as to the consenting party's authority, however, a "warrantless entry without further inquiry is unlawful." Id. at 188-189.
 {¶ 21} In this case, Deborah repeatedly referred to the safe as her husband's safe. Moreover, she did not have any knowledge regarding the location of the key. Finally, she was unaware of the distinctive characteristics of the key. We agree with the trial court that these facts should have put the deputies on notice that Deborah did not have authority to consent to the search of the safe. See Riley v. Gray (C.A. 6, 1982),674 F.2d 522, 528 (since the consenting party neither had possession of the keys, nor permission to enter the area searched, the consenting party did not have the apparent authority to consent to the search); State v. Havranek (Oct. 2, 1980), 8th Dist. No. 41123, 1980 Ohio App. LEXIS 10333, at *10-*11 (apparent authority was lacking where the consenting party was not permitted in the area searched); United States v. Salinas-Cano (C.A. 10, 1992),959 F.2d 861, 864-866 (since certain containers, such as "suitcases, footlockers, strong boxes, etc.," command a high degree of privacy, the consenting party did not have apparent authority to consent to a search of an unlocked suitcase, which the officer knew did not belong to the consenting party and which the consenting party was not permitted to use); cf. Groves v.Ohio (Apr. 9, 1992), C.A.6 No. 91-3791, 1992 U.S. App. LEXIS 7432, at *5-*6 (since the consenting party exhibited "some degree of familiarity with and control over" the items searched, the officer was reasonable to conclude that the consenting party had authority); United States v. Bivens (Jan. 22, 1999), C.A.6 No. 96-6622, 1999 U.S. App. LEXIS 1198, at * 10-*12 (the consenting party had apparent authority to consent to the search where the facts revealed that she had a key to the area searched and that her personal belongings where located in the area searched). Thus, we find that the warrantless entry was unlawful.
 {¶ 22} However, "illegally obtained evidence is properly admitted in a trial court proceeding once it is established that the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation." State v. Perkins
(1985), 18 Ohio St.3d 193, syllabus. The prosecution has the burden to establish that the police "would have ultimately discovered the illegally obtained evidence apart from the unlawful conduct." State v. Fernandez, 11th Dist. No. 2001-L-162, 2002-Ohio-7140, at ¶ 34 (citation omitted); see, also, Nix v. Williams (1984), 467 U.S. 431, 444 ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means * * * then the deterrence rationale has so little basis that the evidence should be received."). Thus, since the state failed to argue in the trial court that the contents of the safe inevitably would have been discovered, the state failed to bear its burden that it would have ultimately discovered the evidence at issue. See State v. Hunter,153 Ohio App.3d 628, 2003-Ohio-4204, at ¶ 21.
 {¶ 23} Even if the state argued in the trial court that it would have inevitably discovered the contents of the safe because it had probable cause to search and, thus, could have obtained a search warrant, its claim here on appeal, the application of the inevitable discovery doctrine in this situation is inappropriate. "[T]he inevitable discovery doctrine exception does not apply in situations where the government's only argument is that it had probable cause for the search." United States v. Souza (C.A. 10, 2000), 223 F.3d 1197, 1203. "To apply the inevitable discovery doctrine whenever police could have obtained a warrant, yet chose not to, would essentially eliminate the warrant requirement and encourage police to proceed without a neutral and detached magiatrate's probable cause determination." State v. Coyle
(Mar. 15, 2000), 4th Dist. No. 99 CA 2480, 2000 Ohio App. LEXIS 1079, at *19 (citations omitted); see, also, State v. Pearson
(1996), 114 Ohio App.3d 153, 163 ("the State's argument [that the inevitable discovery doctrine applies because the police possessed probable cause and could have obtained a search warrant] would obviate any Fourth Amendment warrant requirement as long as it could be show later that a warrant would in all probability have been obtained"); United States v. Echegoyen
(C.A. 9, 1986), 799 F.2d 1271, 1280 fn. 7 ("to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment"); United States v. Johnson (C.A. 6, 1994),22 F.3d 674, 683 ("to hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause").
 {¶ 24} Otherwise tainted evidence is admissible "if the state learns of the questioned evidence from a source separate and distinct from an illegal source." State v. Smith (1991),73 Ohio App.3d 471, 477, citing Wong Sun v. United States (1963), 371 U.S. 471-487-488. "[T]he State must show that the police possessed the leads making the discovery inevitable at the time of the misconduct and that the police were actively pursuing an alternative line of investigation prior to the misconduct."State v. Taylor (2000), 138 Ohio App.3d 139, 151 (emphasis added) (citation omitted). Thus, "the doctrine may apply where, in addition to the existence of probable cause, the police had taken steps in an attempt to obtain a search warrant." Souza,223 F.3d at 1203; see, also, State v. Morse, 5th Dist. No. 2003CA00191, 2004-Ohio-615, at ¶¶ 14-15 (applying the inevitable discovery doctrine where the officer "made an independent decision to acquire a search warrant" and took steps to obtain such a warrant); United States v. Brown (C.A. 7, 1995),64 F.3d 1083, 1085 ("what makes a discovery `inevitable' is not probable cause alone, * * * but probable cause plus a chain of events that would have led to a warrant * * * independent of the search");Shugart, 889 F. Supp. at 976 ("For the `inevitable discovery' exception * * * to apply, the government must prove by a preponderance of the evidence (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial alternative line of investigation at the time of the constitutional violation.").
 {¶ 25} In this case, there is nothing in the record that would indicate that any steps were taken to obtain a warrant. In fact, the record demonstrates that the deputies never attempted to, or even considered, obtaining a warrant. Thus, even though arguably there was sufficient probable cause to obtain a search warrant, application of the inevitable discovery doctrine is not warranted in this case because there were no steps taken in an attempt to do so. See Masten, 1989 Ohio App. LEXIS3723, at *20-*21; see, also, Souza, 223 F.3d at 1203; Brown,64 F.3d at 1085; cf. Morse, 2004-Ohio-615, at ¶¶ 14-15.
 {¶ 26} Although we recognize the importance of drug enforcement efforts and law enforcement's difficult task in carrying out their duties, "the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." Arizona v. Hicks (1987), 480 U.S. 321, 329.
 {¶ 27} For the foregoing reasons, we hold that the state's sole assignment of error is without merit. The decision of the Ashtabula County Court of Common Pleas is affirmed.
Judgment affirmed.
Ford, P.J., and Rice, J., concur.