[Cite as *State v. Jones*, 2024-Ohio-5501.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220007 |
|  |  | TRIAL NO. B-2002096 |
| Plaintiff-Appellee, | : |  |
|  |  | *O P I N I O N.* |
| vs. | : |  |
|  |  |  |
| MICHAEL JONES, | : |  |
|  |  |  |
| Defendant-Appellant. | : |  |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: November 22, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller,* Hamilton County Public Defender, and *David H. Hoffmann,* Assistant Public Defender, for Defendant-Appellant.

**BOCK, Presiding Judge.**

{¶1}  This case returns to us on remand from the Supreme Court of Ohio. In March 2023, we held that defendant-appellant Michael Jones received ineffective assistance of counsel in violation of his Sixth Amendment rights for failing to challenge the constitutionality of a consent search and protective sweep of a home. *State v. Jones,* 2023-Ohio-844, ¶ 21 (1st Dist.) (*"Jones I"*). We ordered a limited remand and stayed consideration of the remaining assignments of error. The State appealed.

{¶2}  The Supreme Court of Ohio reversed *Jones I* and instructed this court to "enter a judgment that affirms, modifies, or reverses the trial court's judgment of conviction and that decides all of the assignments of error that are not made moot by its ruling on another assignment of error." *State v. Jones*, 2024-Ohio-2719, ¶ 20.

{¶3}  We sustain Jones's first assignment of error and reverse Jones's convictions because he received ineffective assistance of counsel at his suppression hearing. That reversal moots Jones's manifest-weight argument in his third assignment of error and his sentencing-challenge in his fourth assignment of error.

{¶4}  We consider the remainder of Jones's assignments of error. First, we overrule Jones's second assignment of error and affirm the trial court's denial of the motion to suppress that Jones filed below. Officers searched the property under a good-faith belief that the tenant consenting to the search had authority to do so, the affidavit in support of the warrant to search a safe recovered on the property established a nexus between the safe and the alleged criminal activity, and the evidence supports the trial court's finding that the officer's affidavit identifying the tenant as the homeowner was not done in reckless disregard for the truth.

**{¶5}** We likewise overrule Jones's third assignment of error and hold that the evidence was sufficient to convict Jones of the drug offenses because officer testimony describing drugs and Jones's personal documents recovered from the safe, when viewed in a light most favorable to the State, proved that the drugs belonged to Jones.

## I. Facts and Procedure

**{¶6}** An anonymous tip sparked an investigation into drug activity at a Clinton Springs Avenue residence in Cincinnati, Ohio. As a result of that investigation, police surveilled Jones as he left that residence in a van driven by his mother. Officers followed the van into a gas station and arrested Jones. They recovered cash, a scale, a wallet, keys, cell phones, and what they suspected was a controlled substance.

**{¶7}** The police returned to the Clinton Springs Avenue residence with the keys. There, they opened the front door and announced their presence. William Gaston greeted the officers. After a discussion with police, Gaston consented to a search of the residence. Hours later, he signed a consent-to-search form. In the residence, police discovered a safe in a third-floor room. Officers secured a search warrant, opened the safe, and found multiple bags of substances along with personal papers. The State charged Jones with ten drug-related felonies, including trafficking in drugs, aggravated trafficking in drugs, and possession of drugs.

**{¶8}** Jones moved to suppress the evidence recovered from the safe, arguing that his Fourth Amendment rights were violated because Gaston had no authority to consent to a search of the residence, and that the affidavit for the warrant to search the safe was deficient and contained reckless falsehoods. The homeowner, Jones, Gaston, and two police officers testified at the suppression hearing. The trial court denied Jones's motion to suppress.

3

*The State's case*

{¶9}   At trial, Officer Mark Bode described the investigation of the Clinton Springs Avenue residence and Jones, "a suspect of trafficking in drugs." Bode had worked as an officer for 22 years and made more than 500 drug-related arrests.

{¶10}   On the day of Jones's arrest, Bode watched as the van carrying Jones "pulled up [and] parked next to [a tan BMW]." Bode recalled that, with the windows down, there was a "quick exchange" that lasted "20 seconds" before the van continued driving. Bode testified that the exchange was "[h]and-to-hand through the window." Later, Bode learned that Jones's mother was driving the van. Officers searched Jones's mother but found no illegal substances or contraband.

{¶11}   Bode explained that officers searched Jones after his arrest and found "a small amount of drugs," $1,000, a digital scale, and three cellular telephones. When questioned by the officers, Jones "denied any association with [the residence], denied leaving there." The parties stipulated to the admission of a lab report that included test results identifying residue on the scale as cocaine.

{¶12}   Sergeant James Davis oversaw the investigation into Jones and the residence. After Jones's arrest, Davis and Bode went to the house on Clinton Springs Avenue "with the keys [officers] recovered from the defendant." Davis "knocked on the door and the tenant of the house came to the door." Officers interviewed Gaston, who informed officers that "Mr. Jones occasionally stayed there." Gaston consented to a search, and the State admitted the signed consent-to-search form. During questioning, Gaston described Jones and directed officers "to the room on the third floor." Davis testified that officers encountered Matthew Allwood in a second-floor bathroom and found "U.S. currency, Ecstasy, cocaine, and personal paperwork."

{¶13} Bode focused on the third-floor bedroom. Portions of the bodycam videos were played at trial and suggest that the bedroom door was locked. While the third-floor bedroom was neat and "nothing appeared to be hidden," Bode noticed a locked safe in the middle of the room. Bode "recovered the safe and then authored a search warrant that was signed the next day by a municipal court judge."

{¶14} Operating under that search warrant, officers opened the safe and found drugs, money, paperwork, and four digital scales. Bode explained that there was a "bag containing numerous bags of drugs inside." Bode testified that the items from the safe were tested by the Hamilton County Crime Laboratory.

{¶15} The lab tested the residue on a digital scale recovered from the safe, and the test revealed that the residue included "cocaine and fentanyl." Bode explained that a bag of "green substance" from the safe tested positive for "18.120 grams of methamphetamine." There were "47 green pills" found in the safe, which tested positive for "5.060 grams of fentanyl." Testing showed that a substance in two bags was a heroin and fentanyl mixture, weighing 15.294 and 14.119 grams, respectively.

{¶16} Bode testified that an individual using a heroin and fentanyl mixture would use "a tenth, two-tenths of a gram" to get high. The officers recovered roughly 30 grams of the heroin and fentanyl mixture, or "hundreds and hundreds of unit doses." Bode explained that drug dealers sell individual doses "by the tenth of grams." But bulk amounts are sold by the quarter ounce, and Jones was believed to be selling "[h]alf ounces." According to Bode, the 30 grams of the heroin and fentanyl mixture exceeded the purchasing power of a person in the throes of a drug addiction.

{¶17} There were "little tablet[s] of like maybe a little teddy bear or something with a Y on it," which Bode explained is "common[ly] what Ecstasy tablets look like."

The safe held "multiple other tablets of similar design" in a bag. Testing revealed that those tablets are "5.480 grams of methamphetamine."

{¶18} There was a bag filled with 60 pills found in the safe, some marked "G3722" and others marked "XANAX." Testing identified both sets of pills as 55 doses of flualprozalam, weighing 15.758 grams.

{¶19} Bode has seen an influx of substances "designed to look like a pill" with the use of "a pharmaceutical pill press that you can buy off eBay." He testified that this evades detection by law enforcement because, to an officer conducting a traffic stop, "it appears to be a prescription drug that you can get, a Xanax or anything else."

{¶20} In addition to those substances, the safe held two copies of Jones's social security card, an original and copies of Jones's birth certificate, a receipt with Jones's name and a social security number, a GED certificate issued to Jones, a BMV reinstatement cover sheet for Jones, hospital paperwork with Jones's name and date of birth, Federal Bureau of Prison's paperwork with Jones's name and picture, and other paperwork with Jones's name. There was also paperwork for a woman that Bode was unable to identify. There was a lottery ticket with writing on the back. Bode testified that drug dealers increasingly use lottery tickets when weighing a substance because they are readily available. There was also $5,960 in the safe.

{¶21} Bode described how the behavior of drug traffickers is distinguishable from drug users. Jones was arrested carrying "equipment generally used by drug dealers. . . which is a digital scale." Drug "traffickers are the ones with the scales, the currency, the means to be able to keep a secured location like a safe." People living with addiction are often struggling in life and "don't have $1,000." Drug users "don't need four digital scales," $6,000 in a safe, "five different types of drugs." He testified

6

that the items in the safe were "100 percent indicative of someone selling and distributing drugs in the community, not a person who simply possesses" drugs. Regarding Jones's three cell phones, he explained that it is common for drug dealers to have a business line "that anyone that's looking to purchase drugs" can call, and another line for their personal lives.

{¶22}  Bode also testified that individuals selling drugs typically do not have a stable residence and tend to avoid putting things in their names because they want to avoid detection by law enforcement as well as other dealers.

*Jones's defense*

{¶23}  Jones, Jones's mother, and the owner of the Clinton Springs Avenue residence presented the jury with a different narrative.

{¶24}  The owner of the Clinton Springs Avenue residence testified that it had "been a while" since he had visited the house. Law enforcement did not seek his permission to search the house. The third floor did not require a key to enter. Gaston was the owner's nephew and lived there to keep the house occupied and "maintain the property." Gaston had authority to determine who stayed at the house and did not have to check before making that decision. Jones was also the owner's nephew and "visit[ed]" the house on occasion. The owner did not know whether Jones stayed at the house. The owner had no idea who was at the house on the day of the search.

{¶25}  Jones's mother recalled taking a trip to Atlanta with Jones the week before his arrest. The family, including Jones, drove back to Cincinnati in a rental van. When they arrived in Cincinnati, she dropped Jones off at the Clinton Springs Avenue residence. The following day, she took Jones to a mechanic, who met them at the Clinton Springs Avenue residence and followed Jones and his mother in the rental van.

She did not stop the van before reaching the gas station, and there was no exchange between Jones and the mechanic while Jones was in the van. Jones's mother reviewed the birth certificate found in the safe and noted that his middle name was misspelled.

{¶26} Jones testified that the owner of the Clinton Springs Avenue residence was his uncle, but more like "a father figure." He had visited the house his "whole life" and had stayed there "[a] few hours, a night." He explained that when he returned to Cincinnati from Atlanta late at night, he met Allwood for the first time. Jones testified that when he met Allwood, Gaston told Jones that Allwood "is his little brother," which Jones knew was a lie. Jones had a duffle bag with a change of clothes and slept on the second floor. Jones was unsure where Gaston slept. Jones acknowledged that he had left some personal papers in the house, though he left them in a purple satchel.

{¶27} On the day of his arrest, Jones's friend arrived at the house and asked for a drink. Jones exchanged the drink outside of his friend's car before his mother drove him to the mechanic. Jones recalled hearing someone's horn, so they slowed down. Jones told the officers he does not live at the Clinton Springs Avenue residence. Following his arrest, law enforcement interrogated him in the jail. When asked about the safe, Jones told officers "[i]t's not mine." Jones testified that he did not even know that there was a third floor in the house. The third floor was locked, and Gaston "goes in and out of that attic." He testified that he did not own the safe or know the combination, had never placed anything into the safe, and had not seen the drugs recovered from the safe before his trial.

{¶28} The jury found Jones guilty on all counts. The trial court merged the possession counts into the trafficking counts, and sentenced Jones to an aggregate 22-to-24-year-and-six-month sentence.

## II.    Law and Analysis

### A.   Jones received ineffective assistance of counsel

{¶29}  We incorporate our ineffective-assistance-of-counsel discussion from *Jones I* and we summarize portions of that discussion that explain our conclusions.

{¶30}  As discussed in *Jones I*, to succeed on an ineffective-assistance-of-counsel claim, Jones had to "show that his counsel's performance was deficient and that he suffered prejudice because of that deficient performance." *See Jones I*, 2023-Ohio-844, at ¶ 8 (1st Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

{¶31}  In *Jones I*, we determined that Jones's trial counsel (1) was aware that suppressing the contents of the safe was critical to Jones's defense, (2) had a reasonable basis for asserting that Gaston's consent to search the property was involuntary and the officers' protective sweep of the property was not justified, and (3) either failed to investigate these issues or disregarded them. *See Jones I* at ¶ 7-21. Accordingly, we determined that Jones's counsel provided unconstitutionally deficient representation and that a reasonable probability existed that but for the deficient representation, the outcome of the trial would have been different. *Id*. at ¶ 21.

### 1.   Gaston's consent to search the property

{¶32}  In *Jones I*, we acknowledged that warrantless searches of a home are presumptively unconstitutional, but an exception exists when officers obtain "freely and voluntarily given" consent to search the home from a person with authority over the premises. *Jones I* at ¶ 11, quoting *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968) (Additional internal citations omitted.).

{¶33}  Bodycam footage shows that, upon arriving at the property, an officer told Gaston, "We've got—we're going to be doing a search warrant here." Gaston did

9

not sign the consent-to-search form until two hours after officers arrived and performed a protective sweep.

**{¶34}** We held:

The totality of the circumstances show that the signed consent-to-search form was not a product of consent, but an acquiescence to a claim of lawful authority. "[T]here can be no consent" when the consent "had been given only after the official conducting the search has asserted that he possesses a warrant." *Bumper* at 548. When officers identify a warrant as the basis of authority for searching a home, they communicate "that the occupant has no right to resist the search." *Id.* These instances are "instinct with coercion" and "[w]here there is coercion[,] there cannot be consent." *Id.* at 549. Indeed, "[t]he result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all." *Id.* at 549-550.

Gaston signed the consent-to-search form after he was made to believe that the officers were at the home to execute a search warrant, and after a team of officers swept through the house with Gaston on the porch in handcuffs.

*Jones I,* 2023-Ohio-844, at ¶ 13-14 (1st Dist.). We held that Jones's counsel ignored a potentially meritorious claim—that Gaston's signature on the consent-to-search form was an acquiescence to the police officers who announced that they possessed a search warrant. *Id.*

*2. Officers' protective sweep*

**{¶35}** Next, in *Jones I*, we held that counsel ignored a second potentially meritorious claim under *Maryland v. Buie*, 494 U.S. 325, 337 (1990), that officers lacked a reasonable suspicion of danger in the house to warrant a protective sweep. *Jones I* at ¶ 15-19. The *Buie* court described the purpose of a protective sweep as "officers [] taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Buie* at 337.

**{¶36}** We explained in *Jones I*:

To justify a protective sweep, there must be ""'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing," that the area swept harbor[s] an individual posing a danger to the officer or others.'" *State v. Nelson,* 2016-Ohio-5344, ¶ 17 (1st Dist.), quoting *Buie* at 337, quoting *Michigan v. Long*, 463 U.S. 1032, 1049-1050 (1983), quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968). This requires "'more than ignorance or a constant assumption that more than one person is present in a residence.'" *State v. Byrd,* 2017-Ohio-6903, ¶ 32 (2d Dist.), quoting *United States v. Archibald,* 589 F.3d 289, 300 (6th Cir.2009). For instance, the unconstitutional sweep in *Byrd* was "more consistent with conducting a protective sweep as a matter of course rather than doing so due to any heightened safety concerns derived from particular observations or information the officers obtained after arriving" at the house. *Id.*

(Cleaned up.) *Jones I* at ¶ 16.

**{¶37}** At the suppression hearing, an officer testified that he had no reason to believe that anyone was inside of the house. Moreover, nothing in the bodycam footage gave rise to "a reasonable suspicion of danger" in the house. Accordingly, we held that Jones's counsel ignored the potentially meritorious claim challenging the constitutionality of the protective sweep under *Buie*.

**{¶38}** Jones's counsel ignored the clear application of both *Bumper* and *Buie*, and his decision to forego those claims is contrary to prevailing professional norms. And the prejudice to Jones is clear. The warrantless search, or sweep, of the house resulted in the discovery of the safe. *Jones I,* 2023-Ohio-844, at ¶ 27 (1st Dist.).

### 3. *Exclusionary rule*

**{¶39}** Generally, when evidence is obtained in violation of the Fourth Amendment, as Jones asserts here, the exclusionary rule precludes the admission of that evidence. *Id.* at ¶ 23, citing *State v. Banks-Harvey*, 2018-Ohio-201, ¶ 25. But an exception to the exclusionary rule allows the admission of illegally-obtained evidence if the state inevitably would have discovered that evidence in the course of a lawful investigation. *Id.*

**{¶40}** In *Jones I*, we acknowledged the State's claim that the facts known to the officers before the sweep—the anonymous complaints, police observations, Jones's arrest, and the items found on Jones—would have justified a search warrant. *Id.*

**{¶41}** We explained, however, that tips from an anonymous informant must be independently corroborated and "'[c]ourts must be wary of anonymous tips.'" *Jones I,* 2023-Ohio-844, at ¶ 24 (1st Dist.), quoting *State v. Smith*, 2005-Ohio-5204, ¶ 1 (1st Dist.). In this case, although officers surveilled the house for weeks, they observed no

drug-related activity. *Id.* Moreover, we found that the State's inevitable-discovery argument was speculative:

> The Fourth Amendment demands that inevitability must be couched in terms of a probability rather than a possibility. The inevitable-discovery exception does not apply merely when officers "could have obtained a warrant, intended to obtain a warrant, or later obtained a warrant." *State v. Foster*, 2015-Ohio-3401, ¶ 15 (3d Dist.). Rather, "investigative procedures independent of the illegal conduct that would have ultimately led to the inevitable discovery of the evidence must be in place and implemented prior to the discovery of the evidence by illegal means." *State v. Porter*, 2008-Ohio-4627, ¶ 43 (2d Dist.). The inevitable-discovery exception "may not be used [] to rehabilitate evidence seized without a warrant." *Foster* at ¶ 9. When we review the record, there must be some evidence "that would indicate that []steps were taken to obtain a warrant." *State v. Hatcher*, 2004-Ohio-2451, ¶ 23 (11th Dist.). In *Hatcher*, the court rejected the application of the exception despite the arguable presence of probable cause to obtain a search warrant "because there were no steps taken in an attempt to do so." *Id.* At the other end of the spectrum, the application of the inevitable-discovery exception is clear when officers secured a search warrant for the defendant's home before the constitutional violation. *State v. Riffle*, 2019-Ohio-3271, ¶ 17 (8th Dist.).

> In its current form, the record is more consistent with *Hatcher* and lacks any indication that the officers were securing a warrant. To

13

hold otherwise "'would essentially eliminate the warrant requirement and encourage police to proceed without a neutral and detached magistrate's probable cause determination.'" *State v. Alihassan*, 2012-Ohio-825, ¶ 30 (10th Dist.), quoting *State v. Coyle*, 2000 Ohio App. LEXIS 1079 (4th Dist. Mar. 15, 2000). Application of the inevitable-discovery exception is improper in situations that "encourage police to engage in their own Fourth Amendment speculation without a prior probable cause determination by a court and foster a 'search-first' mentality that disregards constitutional safeguards." *Id.* at ¶ 30.

*Id.* at ¶ 25.

**{¶42}** In other words, we rejected "an application of the exception that would swallow the rule." *Id.*

### 4. *Jones's counsel was constitutionally ineffective*

**{¶43}** In sum, we hold that Jones received ineffective assistance of counsel when his attorney failed to raise the suppression claims, despite clear Supreme Court of the United States precedent holding that consent to search property is invalid unless it is freely given and that a protective sweep must be justified by specific facts warranting an officer's belief that a person posing a danger is inside the property. When a defendant like Jones suffers a Sixth Amendment violation, courts must tailor the remedy to the injury suffered. *See Lafler v. Cooper,* 566 U.S. 156, 170 (2012). The remedy must "'neutralize the taint of the violation.'" *Id.,* quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981). With that principle in mind, we sustain Jones's first assignment of error and reverse his convictions. We remand the cause to the trial court to allow Jones to file a motion to suppress evidence and for a new hearing.

B. The trial court properly denied Jones's original motion to suppress

**{¶44}** In his second assignment of error, Jones argues that the trial court erred when it denied his original motion to suppress. In that motion, Jones challenged the validity of the warrant arguing that Gaston lacked authority to consent to the search and Bode's affidavit failed to establish probable cause to search the safe.

**{¶45}** As an initial matter, this assignment of error is not made moot by our resolution of Jones's first assignment, because ineffective assistance of counsel at the suppression stage does not, by that very fact, result in a suppression of the evidence. Jones's motion challenged the search of the home on alternative grounds, arguing that Gaston lacked authority to consent to a search of the home and that the affidavit supporting the search warrant failed to establish probable cause to search the safe. In other words, the first assignment of error has not ended the controversy surrounding the trial court's denial of his motion to suppress. *See State ex rel. Cincinnati Enquirer v. Hunter,* 2014-Ohio-5457, ¶ 4. This assignment of error is still potentially dispositive of the suppression of the evidence.

**{¶46}** On appeal, Jones disputes the legitimacy of the warrant authorizing a search of the safe. He argues that law enforcement should have contacted Boyd, the owner of the house, to see if Gaston had authority to consent to the search. Next, he contends that the affidavit was insufficient to establish probable cause to search the safe, and the affidavit contained falsehoods and mischaracterizations that undermined the basis for finding probable cause to search the safe.

**{¶47}** An appeal of the trial court's decision to deny a motion to suppress presents a mixed question of law and fact. *State v. Curry*, 2022-Ohio-627, ¶ 12 (1st Dist.). We accept the trial court's factual findings if they are supported by competent

and credible evidence. *Id.* at ¶ 13. But we independently determine whether those facts satisfy the legal standard without deferring to the trial court's legal conclusions. *Id.*

### 1. *The search was conducted under a good-faith belief that Gaston had authority to consent to a search of the property*

**{¶48}** A warrantless search of a house does not violate the Fourth Amendment to the United States Constitution when police obtain consent to search from the home's occupier or "a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *see State v. Posey*, 40 Ohio St.3d 420, 427 (1988). A person with "'joint access or control for[,] most purposes[,]'" of a property has common authority over the premises and can consent to a search. *Rodriguez* at 181, quoting *United States v. Matlock*, 415 U.S. 164, 171, fn.7 (1974). The State has the burden of establishing third-party consent. *Rodriguez* at 181. Moreover, the Fourth Amendment is not violated "when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises." *Id.* at 186.

**{¶49}** The trial court made several factual findings. First, it noted that the "search warrant mistakenly states that Mr. Gaston is the owner of the property," as conceded by the State. It also found that the bodycam footage reveals that "Mr. Gaston states that he is a resident not the owner. But he states that he is the sole tenant of the property before he gives permission for the officers to search it."

**{¶50}** Law enforcement was entitled to rely on Gaston's statement that he was the sole occupant of the house and believe that he had authority to consent to a search of the home. Because the officers believed, in good faith, that Gaston had authority to consent to a search, Jones cannot establish the trial court erred when it denied his motion to suppress.

*2. The affidavit established probable cause to search the safe*

**{¶51}** Jones also claims that the affidavit filed by Bode in support of the warrant to search the safe failed to establish probable cause to search the safe. He argues that both he and Gaston denied owning the safe, and the affidavit for the search warrant failed to establish a nexus between police observations, the anonymous tips, Jones's arrest, and the safe.

**{¶52}** Probable cause is a question of law, determined by the historical facts presented. *State v. Schubert*, 2022-Ohio-4604, ¶ 11. But "'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *State v. George*, 45 Ohio St.3d 325, 329 (1989), quoting *Illinois v. Gates* 462 U.S. 213, 237, fn. 10 (1983). Courts will uphold a warrant so long as "the issuing judicial officer had a substantial basis for believing that probable cause existed, regardless of what the reviewing court's independent determination regarding probable cause might be." *Schubert* at ¶ 11.

**{¶53}** An affidavit supporting a search warrant must contain particular facts and circumstances that demonstrate probable cause so the judicial officer may independently determine whether probable cause exists. *Franks v. Delaware*, 438 U.S. 154, 165 (1978). There must be evidence creating at least some connection between the allegedly illegal activity and the place that law enforcement seeks to search. *Schubert* at ¶ 12.

**{¶54}** Here, the affidavit included Bode's experience investigating drug offenses, referenced "numerous community complaints" about drug activity at the Clinton Springs Avenue residence, described Jones's continued presence at the house, and provided his criminal history, which included convictions for felony drug offenses.

It described seeing Jones leave the house and what officers believed was a hand-to-hand drug deal, and identified the items found on Jones at the time of his arrest. Those items included a digital scale, what police believed was cocaine, and $1,000. The affidavit listed Gaston as the owner of the property. But that statement does not taint the discovery of the safe. These facts included in the affidavit are sufficient to establish a nexus between the safe and the alleged illegal conduct.

### 3. *Bode did not recklessly disregard the truth when he identified Gaston as the homeowner in his affidavit*

**{¶55}** Finally, Jones argues that Bode's affidavit recklessly stated that Gaston owned the property. He argues that, without this false statement, the affidavit fails to establish probable cause to search the safe.

**{¶56}** Affidavits produced in support of a search warrant are presumably valid. *State v. Taylor*, 2007-Ohio-7066, ¶ 12 (1st Dist.). Jones can overcome this presumption by proving, by a preponderance of the evidence, that Bode intentionally included false statements in his affidavit with reckless disregard for the truth. *State v. Harrington*, 2009-Ohio-5576, ¶ 8 (1st Dist.). He must also show that, without the false statement, the affidavit is insufficient to establish probable cause. *Id.*

**{¶57}** The trial court recognized the misstatement in the affidavit and found that Gaston told officers he was the sole resident. The trial court determined this was not reckless. In the alternative, it found that "[s]ubstituting the owner for tenant in the affidavit did not change the fact that Mr. Gaston was authorized to permit the search."

**{¶58}** The trial court's determination that Bode was not reckless is a question of fact. *See United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019); *see also United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011) (holding that "recklessness determination is an 'essentially factual' inquiry"). Reckless disregard is more than a

18

misstatement or inaccuracy. *State v. Freeman*, 138 Ohio App.3d 408, 425 (1st Dist. 2000). Rather, the officer must have serious doubts of the allegation's truth and act in disregard of whether it would mislead the magistrate. *State v. Waddy*, 63 Ohio St.3d 424 (1992), quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990).

{¶59} Bode testified that he heard Gaston state that he lived in the house his entire life, was born in the house, and fixed it up. Bode recognized that he should have written "resident" or "sole resident," which he equated with being the owner of the property. But Bode testified that Gaston told officers that he was the sole resident of the home. Bode's testimony constitutes competent and credible evidence that supports the trial court's finding that his identifying Gaston as the owner of the house was not in reckless disregard for the truth.

{¶60} In sum, Gaston had authority to consent to a search of the home, Bode's affidavit contained sufficient information to establish probable cause to search the safe, and Bode's identification of Gaston as the owner of the Clinton Springs Avenue residence in his affidavit was not made in reckless disregard for the truth. Therefore, we overrule Jones's second assignment of error.

C. *The evidence was sufficient to establish the elements of the trafficking offenses*

{¶61} In his third assignment of error, Jones argues that the evidence was insufficient to convict him of the trafficking counts in violation of R.C. 2925.03(A)(2), and that his convictions were against the manifest weight of the evidence.

{¶62} Our resolution of Jones's first assignment of error renders his manifest-weight argument moot. *See State v. Lewis,* 2023-Ohio-3036, ¶ 28 (1st Dist.). But Jones's sufficiency argument is not moot. *State v. Johnson*, 2024-Ohio-1147, ¶ 24 (1st Dist.). This is because "the state is not entitled to retry a criminal defendant after

reversal for trial court error if the state failed in the first instance to present sufficient evidence." *State v. Gideon*, 2020-Ohio-6961, ¶ 27. While we hold that Jones presented arguably meritorious Fourth Amendment claims, the Supreme Court of Ohio has held that a sufficiency analysis includes consideration of "all evidence admitted at trial, including the improperly admitted evidence that was the source of the reversal for trial error." *Id.* at ¶ 29, citing *State v. Brewer*, 2009-Ohio-593, ¶ 24-26.

{**¶63**} To review the sufficiency of the evidence, we must determine whether a rational trier of fact could find that the evidence, when viewed in a light most favorable to the state, established the elements of the offenses beyond a reasonable doubt. *State v. Devaughn*, 2020-Ohio-651, ¶ 19 (1st Dist.).

{**¶64**} Relevant here, R.C. 2925.03(A)(2) prohibits a person from knowingly transporting, delivering, preparing for distribution, or distributing a controlled substance, when the offender knows or has reason to know the controlled substance is intended for sale or resale by the offender.

{**¶65**} Jones argues that the evidence failed to establish that the drugs found in the safe were his. Of course, a person must possess a substance to traffic it. *See State v. Stribling*, 2008-Ohio-4577, ¶ 33 (8th Dist.). Possession of a substance "may be actual or constructive and may be proven by circumstantial evidence." *Devaughn* at ¶ 32. Constructive possession exists where a person is conscious of an object and can "exercise dominion and control over [it]." *Id.*, citing *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus.

{**¶66**} Specifically, he argues that Bode's testimony that Jones's personal papers were found in the safe cannot be relied on because Bode's "credibility in this case was seriously compromised." He points to several statements by Bode that are

contradicted by other witnesses or bodycam footage. Plus, he testified that he kept his personal papers in a satchel, not in the safe. But these arguments relate to manifest weight, rather than sufficiency, of the evidence. They involve credibility determinations, which "is a jury issue and not a proper matter on review of sufficiency of the evidence." *State v. Dean*, 2015-Ohio-4347, ¶ 169.

**{¶67}** When viewed in a light most favorable to the state, a rational juror could find, based on Bode's testimony and the photographs of the safe and its contents, that Jones's personal papers were found in the safe and that the drugs in the safe belonged to Jones. Moreover, a rational juror could find that the presence of the scales, multiple cell phones, money, and large amounts of various illegal drugs established that Jones was trafficking those drugs, rather than simply using them.

**{¶68}** Because the evidence was sufficient to establish the elements of the drug-trafficking offenses, we overrule Jones's third assignment of error.

### D. *Jones's sentencing argument is moot*

**{¶69}** Finally, Jones argues that his indefinite sentences are unconstitutional. But reversing his convictions renders his sentencing argument moot. *See Lewis,* 2023-Ohio-3036, at ¶ 28 (1st Dist.).

## III. Conclusion

**{¶70}** We sustain Jones's first assignment of error, reverse his convictions, and remand this cause to the trial court to allow Jones to file a motion to suppress the evidence and for a new suppression hearing. We overrule his second and third assignments of error. Jones's fourth assignment of error and his manifest-weight arguments are moot, and we do not address them.

Judgment reversed and cause remanded.

**BERGERON, J.,** concurs.
**WINKLER, J.,** concurs in part and dissents in part.

**WINKLER, J.**, concurring in part and dissenting in part.

{¶71} I dissent from the portion of the majority's opinion sustaining Jones's first assignment of error, in which the majority holds that he was denied the effective assistance of counsel, for the reasons stated in my dissent in the previous opinion. *See State v. Jones*, 2023-Ohio-844, ¶ 31-48 (1st Dist.) (Winkler, J., dissenting) ("*Jones I*"). Prejudice from defective representation is sufficient to justify a reversal of a conviction only where the result of the proceeding was unreliable or fundamentally unfair because of counsel's performance. *Lockhart v. Fretwell*, 506 U.S. 364, 369-370 (1993); *State v. Hackney*, 2016-Ohio-4609, ¶ 38.

{¶72} First, I do not believe that Jones had standing to contest the search of the safe. At the hearing on the motion to suppress, he testified that his cousin's father owned the house, that he grew up there, and that he stayed there overnight on occasion. He estimated that in April 2020, he stayed there three to four times. Additionally, at the trial, he testified that he had never lived in the house, that he had never spent more than one night there, that he had no access to the locked third floor where the safe was found, and that he knew nothing about the safe. *Jones I* at ¶ 33.

{¶73} "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his *Fourth Amendment* rights infringed." (Emphasis in original.) *State v. Brown*, 2013-Ohio-2720, ¶ 10, quoting *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). Because he had no standing to challenge the search, he was not prejudiced by counsel's failure to raise issues related to the search.

{¶74} Assuming for the sake of argument that Jones had standing, the police officers' actions were reasonable under the Fourth Amendment. The protective sweep was justified due to concerns for officer safety, and the intrusive nature of the protective sweep was minimal compared to the need to protect officer safety. *Jones I*, 2023-Ohio-844, at ¶ 37-42 (1st Dist.) (Winkler, J., dissenting).

{¶75} Further, even if the protective sweep was improper, the evidence obtained from the search of the safe was admissible under the inevitable-discovery exception to the warrant requirement. The discovery of the safe was inevitable given the facts and circumstances known to the police before they entered the residence, providing sufficient probable cause to allow the officers to obtain a warrant. The police would have been justified in freezing the scene to prevent any destruction or spoilage of evidence while they waited for a warrant to search the house. *Id.* at ¶ 44-46.

{¶76} Because the police officers' actions were reasonable under the Fourth Amendment, Jones has failed to meet his burden to show that, but for counsel's deficient performance, the result of the proceeding would have been different or that the result of the proceeding was unreliable or fundamentally unfair. Therefore, I would overrule Jones's first assignment of error.

{¶77} I concur in the majority opinion overruling Jones's second assignment of error. The majority is of the opinion that the police had the right to rely on Gaston's consent to search the property. I agree. If the search was conducted in good faith, then it does not matter if Gaston's consent was voluntary or involuntary. But I do not believe that we need to reach that issue because, as I said in my previous dissent, the safe would have been inevitably discovered. *Jones I*, 2023-Ohio-844, at ¶ 49 (Winkler, J.,

dissenting). I agree with the majority's conclusion that the warrant to search the safe was supported by probable cause.

{¶78} Under Jones's third assignment of error, the majority holds that the evidence is sufficient to support Jones's convictions. I agree. *See id.* at ¶ 50. The majority also holds that Jones's manifest-weight argument was moot, based on its conclusion in the first assignment of error that the convictions must be reversed for ineffective assistance of counsel. I would hold that Jones's convictions were not against the manifest weight of the evidence and overrule his third assignment of error in toto. *See id.* at ¶ 51.

{¶79} The majority also held Jones's fourth assignment of error to be moot. Jones argues that the trial court erred in sentencing him to an indefinite prison term under the Reagan Tokes Law. In my dissent, I stated that I would overrule that assignment of error based on *State v. Guyton*, 2022-Ohio-2962 (1st Dist.), in which this court held that the Reagan Tokes Law was constitutional. *Jones I* at ¶ 52. Subsequent to our previous opinion, the Ohio Supreme Court held the law to be constitutional in *State v. Hacker*, 2023-Ohio-2535. Consequently, I would overrule Jones's fourth assignment of error.

{¶80} In sum, I see no merit in Jones's arguments. I would overrule his four assignments of error and affirm his convictions in all respects.

Please note:

The court has recorded its entry on the date of the release of this opinion.